## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |  |
|---|---|---|
| JULIE A. SU, ACTING SECRETARY OF LABOR, U.S. DEPARTMENT OF LABOR, | ) ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION |
| v. | ) ) | Case No. |
| SUFFOLK ADMINISTRATIVE SERVICES, LLC; PROVIDENCE INSURANCE CO., I.I.; ALEXANDER RENFRO; WILLIAM BRYAN; ARJAN ZIEGER | ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Julie A. Su, Acting Secretary of the United States Department of Labor ("Secretary"), alleges as follows:

### INTRODUCTION

1.     Since at least 2016, Defendants Suffolk Administrative Services, LLC ("SAS") and Providence Insurance Company, I.I. ("PIC")—collectively "Providence" or the "Providence Companies"—and their owners and executives Alexander Renfro, William Bryan, and Arjan Zieger, have been marketing, selling, and servicing employer-sponsored health benefit plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001. Providence markets its plans—the majority of which cover only preventive services and nothing more—as an "affordable" way for employers to offer health benefits to their employees while complying with the patient protections imposed by the Affordable Care Act ("ACA") and incorporated in ERISA. But

what Providence does not disclose is that Defendants use the plans as vehicles to collect and divert to themselves massive fees through self-dealing in violation of ERISA.

2.      Defendants' ERISA violations stem from their control over ERISA-plan assets. Though Defendants sell plans to separate and distinct employers, Defendants pool the plans' monthly contributions together, and service the plans with the same slate of service providers (including the Providence Companies), through a structure known as a multiple employer welfare arrangement ("Providence MEWA"). 29 U.S.C. § 1002(40)(A).[1] Because the Plans are "self-funded"—meaning that claims are paid out of Plan funds rather than by an insurance company—the Plans' monthly contributions to the MEWA are earmarked for benefit payments, and are thus assets of the Participating Plans, not of the MEWA or the Providence Companies.

3.      However, SAS and its executives—not the Participating Plans—decide on their own how much to take from those Plan assets for SAS and the other service providers as fees. Indeed, the Participating Plans agree only to pay a set monthly contribution amount; they do not agree on or approve how their contribution payments are allocated among the Plans' service providers, including to SAS and PIC. Rather, those decisions are made exclusively by SAS and SAS's executives.

---

[1] Since 2016, over 1,900 employers, located across at least 45 states, have established ERISA-governed health plans through the Providence MEWA. The Providence MEWA also includes health plans for multiple limited partnerships. Those limited partnership plans are the subject of an advisory opinion issued by the U.S. Department of Labor, which concluded that plans sponsored by such limited partnerships are not governed by ERISA. The advisory opinion was challenged and vacated in another litigation, *Data Marketing Partnership, LP v. United States Department of Labor, et al.*, No. 4:19-cv-800 (N.D. Tex.). The U.S. Court of Appeals for the Fifth Circuit affirmed the vacatur and remanded the case, and proceedings remain ongoing. *Data Marketing Partnership, et al. v. United States Department of Labor*, 45 F.4th 846 (5th Cir. 2020). The limited partnership plans are not among the Participating Plans at issue in this Complaint.

4.      In determining which service providers to pay with the Plans' assets and how much to pay them, SAS and its executives violate their duties under ERISA in a variety of ways. First, SAS and its executives engage in self-dealing by unilaterally determining SAS's own service-provider fee and directing the payment of those fees to itself from Plan assets, without any review or approval by an independent Plan fiduciary (*i.e.*, a non-Providence-related fiduciary of the Participating Plans). SAS and its executives also violate their fiduciary duties of prudence and loyalty in setting SAS's fees because those fees are excessive relative to the services SAS provides.

5.      Second, SAS and its executives also engage in self-dealing by unilaterally determining how much to pay SAS's affiliate, PIC—which is owned and operated by the same individual defendants that own and operate SAS—to serve as a "reinsurer" to the Participating Plans, without any review or approval by an independent Plan fiduciary. Here too, PIC's fees are excessive relative to the services it provides—indeed, PIC has not paid a single dollar of reinsurance—and, by approving PIC's fees, SAS and its executives violate their fiduciary duties of prudence and loyalty. For its part, PIC is liable for knowingly participating in these ERISA violations.

6.      Third, SAS and its executives breach their fiduciary duties by directing payment out of Plan assets to entities that market the MEWA to prospective employers and initially enroll the Participating Plans. Not only do the enrollers provide no discernible service to the Participating Plans, but the fees that SAS and its executives authorize be paid to them are excessive.

7.      The Secretary brings this action to redress Defendants' ERISA violations by restoring the Plans' losses, recovering unjust profits, and obtaining other remedial and

equitable relief, including enjoining Defendants from acting as fiduciaries or service providers to ERISA-covered employee benefit plans in the future.

## JURISDICTION AND VENUE

8.      This action arises under ERISA and is brought by the Secretary to obtain relief under 29 U.S.C. §§ 1109 and 1132(a)(2) and (5), to redress violations and enforce the provisions of Title I of ERISA.

9.      This Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1). The subject of the Secretary's Complaint is a MEWA (the Providence MEWA) as defined by 29 U.S.C. § 1002(40)(A), to which over 1,900 employers subscribed since 2016 for the purpose of providing health benefits to their employees, and in so doing established employee welfare benefit plans under ERISA (*i.e.*, the Participating Plans), 29 U.S.C. § 1002(1).

10.      Venue is appropriate in this district under 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1391(d), because SAS and PIC are headquartered in Puerto Rico, and they reside within this district. The Providence MEWA is administered by Providence in Puerto Rico and several of the alleged breaches took place here.

## PARTIES

11.      The Secretary is vested with the authority to enforce the provisions of Title I of ERISA by, among other means, the filing and prosecution of civil claims against fiduciaries and other parties who violate ERISA. 29 U.S.C. § 1132(a)(2) and (5).

12.      **Defendant Suffolk Administrative Services ("SAS")** is a limited liability company registered in Puerto Rico. At all relevant times, SAS was owned by two holding companies, Anjo, LLC ("Anjo"), which owned 25% of SAS, and Momentum Capital, LLC ("Momentum Capital"), which owned the remaining 75%, and each company received a

proportional percentage of SAS's profits. SAS consists of three Strategic Business Units: (a) Incela HR ("Incela"); (b) Affordable Benefit Choices ("ABC"); and (c) ouTPAce. These units perform different functions within SAS. Incela generally provides administrative plan services and customer support (including health plan administration, approving fees of service providers, enrollment services, and Form 1094 and 1095 reporting); ABC provides consulting services, benefit designs, and plan documents; and ouTPAce collects a fee but does not provide services to the MEWA. SAS, through its Strategic Business Units, administers the entire Providence MEWA. Executives of SAS include Alexander Renfro (Chief Legal Officer), William Bryan (Chairman), and Arjan Zieger (Vice-Chairman). These executives are among the primary decisionmakers at SAS.

13.    SAS performs functions that render it a fiduciary to the Participating Plans under 29 U.S.C. § 1002(21)(A). These functions include selecting and hiring the service providers to the Plans, determining the compensation for the service providers, and exercising authority over the disposition of Plan assets. As a fiduciary and service provider to the MEWA, SAS is a party-in-interest to the MEWA pursuant to 29 U.S.C. § 1002(14)(A) and (B).

14.    **Defendant Providence Insurance Company, I.I. ("PIC")** is an insurance company incorporated in Puerto Rico. PIC is 100% owned by Suffolk Holdings, LLC ("Suffolk Holdings"). In turn, Suffolk Holdings was owned at all relevant times by Anjo (15% ownership) and Momentum Capital (85% ownership). PIC is a reinsurer to the Participating Plans. PIC's executives are William Bryan (President and Chief Executive Officer), Arjan Zieger (Treasurer and Chief Financial Officer), and Alexander Renfro (Secretary). As a service provider to the Participating Plans, PIC is a party-in-interest to the Plans under 29 U.S.C. § 1002(14)(B).

15.    **Defendant Alexander Renfro ("Renfro")**, at all relevant times, owned 100% of Anjo, and, through his ownership of Anjo, owned 25% of SAS and 15% of PIC, and was entitled to a proportional share of the profits of those companies.[2] Renfro also served as Chief Legal Officer of SAS and Secretary of PIC during the relevant time period.

16.    Renfro performed functions that render him a fiduciary to the Participating Plans under 29 U.S.C. § 1002(21)(A). He exercised discretion over funds of the Participating Plans, including dictating the rates paid to the Providence MEWA's service providers, confirming payment amounts to those service providers, and directing brokers on how to route participant contributions. He also participated in engaging service providers to the Providence MEWA and negotiating terms of the engagement.

17.    **Defendant William Bryan ("Bryan")** owns the Lobos Trust, which owns 50% of Momentum Capital. Through his ownership of Momentum Capital, Bryan owns 37.5% of SAS and 42.5% of PIC, and is entitled to a proportional share of the profits of those companies. He also serves as Chairman of SAS, and as President and CEO of PIC.

18.    Bryan performs functions that render him a fiduciary to the Participating Plans under 29 U.S.C. § 1002(21)(A). He negotiates the terms of engagement of service providers to the Providence MEWA and hires those service providers.

19.    **Defendant Arjan Zieger ("Zieger")** owns the Tasman Trust, which owns 50% of Momentum Capital. Through his ownership of Momentum Capital, Zieger owns 37.5% of

---

[2] Shortly before the filing of this Complaint, on October 29, 2024, counsel for PIC, SAS, Bryan, and Zieger indicated that Renfro divested his ownership interest in SAS and PIC. The attorney did not represent Renfro and did not provide any supporting documentation. A recent ownership divestiture by Renfro, if true, does not impact the Secretary's claims against him for prior or continued actions taken as an officer for SAS and PIC, nor does it change the relief sought by the Secretary, so this Complaint describes Renfro's involvement in the present tense.

SAS and 42.5% of PIC, and is entitled to a proportional share of the profits of those companies. He also serves as Vice-Chairman of SAS, and as Treasurer and Chief Financial Officer of PIC.

20.     Zieger performs functions that render him a fiduciary to the Participating Plans under 29 U.S.C. § 1002(21)(A). He exercises discretion over the Participating Plans' funds by, among other things, setting funding and replenishment levels of the Providence MEWA's claims accounts, approving fees to the Providence MEWA's service providers and directing third party administrators on routing the Participating Plans' assets. He also participates in engaging service providers to the Providence MEWA and negotiating terms of the engagement.

## GENERAL ALLEGATIONS

**I.    Defendants Sell Self-Funded Health Plans to Employers Through the Providence MEWA**

21.     The Providence MEWA, though not itself an employee welfare benefit plan, consists of multiple underlying employee welfare benefit plans created by employers for their employees (*i.e.*, the Participating Plans). The employers that sponsor these Participating Plans are located in at least 45 states across the United States and come from a wide range of industries. The employer-sponsors of the Participating Plans are not under common control and do not have any other cohesive bond. The employers are heterogeneous and unrelated, with the only common purpose being a shared desire for employee medical coverage.

22.     The Providence MEWA uses multiple enrollment companies ("enrollers") to market their plans and to enroll new employers into the arrangement.

23.     Once recruited by an enroller, sponsoring employers create a Participating Plan by signing an Administrative Services Agreement ("ASA") with SAS.[3]

---

[3] Before mid-2016, Participating Plans executed an ASA with a predecessor to SAS, Providence Insurance Partners, LLC ("PIP"). On or about mid-2016, PIP assigned the ASAs to SAS, which took over plan administration services.

24.     SAS provides Participating Plans with Summary Plan Descriptions ("SPDs"), Plan Documents, or both, which outline employee eligibility, describe benefits, explain how the plan is financed, and detail the process for obtaining benefits.

25.     The Participating Plans—as explained in the SPD—are "self-funded" or "self-insured," meaning that the Plan sponsor, not an insurance company, is responsible for the payment of claims.

26.     When employers join the Providence MEWA by establishing a Participating Plan, SAS obtains "reinsurance" for the employer through an insurance policy from PIC called a Contractual Liability Insurance Policy ("CLIP").

27.     The Participating Plans make monthly contribution payments to the Providence MEWA. They pay contributions either directly to the Plan's third party administrator ("TPA")— which is responsible for administering health claims—or to the enroller that recruited the Plan into the MEWA, who then remits the payment to the TPA after taking a fee. As discussed further *infra*, the TPAs use the Plans' payments to (1) pay fees to other service providers as instructed by SAS, and (2) fund pooled accounts from which benefits for the Participating Plans are paid ("Claims Accounts"). If there are Plan contributions remaining after service providers are paid and the Claims Accounts are sufficiently funded, the TPA transfers the balance to PIC.

28.     MEWA administrators are required to file a Form M-1 annually with the Secretary reporting the MEWA's financial condition. The Providence MEWA has never filed a Form M-1.

## II.    SAS and Its Executives Unilaterally Select the Service Providers to the Participating Plans and Determine Their Compensation

29.     One of SAS's primary services to the Participating Plans is vendor management. The ASA states, "[SAS] maintains the right to subcontract services under any of the above

obligations or any aspect of forming, maintaining, or terminating a health and welfare benefits plan or program." It further states that SAS "reserves the right to preselect any subcontracted vendors on behalf of Employer" and provides that "[s]ervices performed by [SAS] under this Agreement may be performed directly by [SAS] or through the use of affiliates, subsidiaries, or sub-contractors."

30.     The employers that sponsor the Participating Plans—who serve as the named plan administrators for their Plans—do not have any involvement in selecting or approving their Plans' service providers other than SAS. They also have no involvement in setting or approving the specific fees paid from Plan contributions (such as administrative fees or insurance premiums) for any service providers to the Participating Plans (including SAS's fee). Those decisions are made exclusively by SAS and its executives, including, at all relevant times, Renfro, Bryan, and Zieger. The employers agree only to the total monthly contributions paid by their respective Plans, but do not authorize or even know the discrete fee paid to each service provider of the Plan.

31.     Among the service providers that SAS, Renfro, Bryan, and Zieger select is PIC, which provides reinsurance for the Participating Plans. PIC's insurance is reflected in the CLIP, which is ostensibly between PIC and the employers. However, the CLIP typically is not executed by the employer. For some Plans, in an attempt to appear as though the employer selected PIC, SAS provides the employer with an appointment form (drafted by SAS) that designates a representative chosen by SAS to procure insurance for the Plan. This representative then executes the CLIP with PIC on behalf of the Participating Plan. In other cases, the CLIP is not signed at all, either by the employer or anyone purporting to represent the employer. Regardless,

in either situation, neither the employer nor another independent fiduciary of the Participating Plan executes the CLIP with PIC.

32.     In addition, SAS, Renfro, Zieger, and Bryan exclusively determine and authorize PIC's compensation based in part on rate-setting calculations performed and/or approved by Renfro, Zieger, and Bryan. Neither the employer-sponsors nor any other independent fiduciary of the Participating Plans authorize or approve PIC's compensation.

33.     SAS, Renfro, Bryan, and Zieger also select the TPAs for the Participating Plans, which have included Boon Group ("Boon"),[4] Hawaii Mainland Administrators ("HMA"), S&S Health, Aither Health, Lucent Health, D.H. Cook, and others. SAS, Renfro, Bryan, and Zieger exclusively determine the compensation for all of the TPAs serving the Participating Plans, without authorization or approval by the employer-sponsors or any other independent fiduciary of the Participating Plans.

34.     SAS's exclusive role in selecting service providers and determining their fees is reflected in the ASAs, which, at all relevant times, have not disclosed to the employers the amount each service provider receives in fees for the services provided to the Plans.

35.     In short, SAS, Renfro, Bryan, and Zieger select all of the service providers to the Participating Plans (other than SAS itself, which employer-sponsors select), and determine their compensation (including SAS's own compensation), without authorization or approval by the employer-sponsors or any other independent fiduciary of the Participating Plans.

---

[4] While PIP initially hired Boon, PIP assigned SAS the obligations and benefits that PIP held in its agreement with Boon. In other words, SAS took over PIP's role in the Providence MEWA's relationship to Boon.

**III.    SAS Directs How TPAs Use Plan Contributions to Pay MEWA Service Providers, Including SAS and PIC**

36.    The ASA between an employer-sponsor and SAS includes a fee schedule for health plan services that lists the overall cost per enrollee per month ("PEPM"). Pursuant to the ASAs, employers make monthly payments (or "contributions") on behalf of their Participating Plan to fund health plan benefits.  The payment is made either to an enroller or to one of the TPAs selected by SAS.

37.    From the contributions they receive, the TPAs pay fees to various service providers to the Participating Plans (including SAS and PIC) based on directions from SAS, referred to as Confidential Payment Instructions ("CPIs").

38.    After paying fees to the Plans' service providers, the TPAs then transfer the Plans' contributions to pooled bank accounts controlled by each of the TPAs, which are used specifically for paying benefit claims ("Claims Accounts").

39.    SAS requires the TPAs to maintain a minimum balance in their Claims Accounts, and the TPAs only place into their Claims Accounts enough of the Participating Plans' contributions as necessary to maintain that minimum balance.

40.    The TPAs each maintain only one Claims Account that includes contributions from multiple Participating Plans without tracking which assets in their Claims Accounts belong to which Plan.

41.    The TPAs use the contributions placed in their Claims Account to pay for claims for all the Participating Plans they service, without regard to whether the funds used to pay a claim come from the contributions of the specific beneficiary's sponsoring employer.

42.     If a TPA has a question about whether a claim is covered under the Plan, they ask SAS for an interpretation of the Plan, which SAS provides. Renfro is often the person interpreting the Plan on behalf of SAS.

43.     Once the TPAs pay all the MEWA's service providers and replenish their Claims Accounts, the TPAs, at SAS's direction, send the remainder of the Participating Plans' contributions to PIC.

## IV.    SAS Directs Substantial Fees to Itself and Other Service Providers

44.     The fees that SAS directs to itself and the other service providers to the Participating Plans exceed the amount spent by the Plans on medical claims.

45.     The medical loss ratio for a health benefits plan is the share of total health care premiums or contributions spent on medical claims. For example, the ACA requires that health insurers in the individual and small group markets allocate at least 80% of premiums towards health care costs and improvements. The remaining 20% of premiums can be allocated towards administrative costs, overhead, and marketing. For the large group market, the percentage that the ACA requires to be allocated towards health care costs is 85%.

46.     From 2016 to 2022, the Providence MEWA, though not subject to the ACA's medical loss ratio standard, had a targeted loss ratio between 27% to 48%. In other words, the MEWA aimed to devote only 27% to 48% of the Plans' contributions to pay for healthcare costs, with the remaining 52% to 73% going towards administrative costs, which are the fees paid to service providers.

47.     The proportion of contributions used by the Providence MEWA to pay administrative fees between 2016 and 2022 were consistent with or exceeded the MEWA's

targeted loss ratios due to both the low number of claims paid and the low dollar amount of claims paid by the MEWA.

48.      Indeed, the ASAs between SAS and participating employers show that the proportion of the Participating Plans' monthly contribution payments that go towards paying administrative costs (such as service provider fees) exceed 50%.  For example, in one ASA between SAS and employer sponsor Maberry Packing, LLC dated 2019, the "Administration Costs" for a single-employee enrollment in a coverage option called WellMEC was $59.89 out of the total $82.50 monthly contribution, or 72%. Similarly, the "Administration Costs" for a single-employee enrollment in another coverage option called WellPrime was $62.95 out of the total $113.45 monthly contribution, or 55.5%.

49.      SAS directs to itself (through CPIs directed to the TPAs) at least one-third of the contribution amounts allocated towards administrative costs. SAS directs these payments without disclosure to, or approval by, the employer-sponsors or any other independent fiduciary of the Participating Plans.  For example, a SAS-created CPI for one of the Participating Plans, sponsored by Tiger Labor and Staffing, lists a $75.00 monthly contribution payment for a single employee enrolled in WellMEC coverage.  Of that amount, $20.81 was paid to ABC (a SAS business unit), and $5.58 was paid to Incela (another SAS business unit) as fees, which means SAS received a total of $26.39 in fees from the $75.00 monthly payment, or 35.2%.  Under the same CPI, for families enrolled in WellMEC coverage, the monthly contribution payment is $205.00, with $111.17 paid to SAS as fees ($105.59 to ABC and $5.58 to Incela), representing 54.2% of the total monthly payment.

50.      As another example, for the Plan sponsored by Wegis Ranch, the monthly cost for single-employee enrollment in WellMEC coverage is $80.00, of which SAS directs the claims

administrator to pay $23.44 to ABC and $2.95 to Incela as fees, for a total of $26.39 paid as fees to SAS, or 33% of the monthly payment. For a family enrollment in WellMEC coverage, the monthly cost is $240.00, with $138.22 paid to ABC and $2.95 paid to Incela as fees, for a total of $141.17 paid as fees to SAS or 58.8% of the monthly payment.

51.     Despite directing substantial fees to itself out of Plan assets, SAS does not actually perform the work of administering the Plans once they are established, which instead falls to other service providers to the Plans, most notably the TPAs. Yet SAS receives far greater compensation than the TPAs. For example, based on the CPI for Tiger Labor and Staffing, for a single-employee enrollment in WellMEC coverage, SAS receives $26.39 (or 35.2%) of the Plan's payment, while the TPA, HMA, receives a flat fee of $16.00 (or 21.3%). Similarly, based on the CPI for Wegis Ranch, for a single-employee enrollment in WellMEC coverage, SAS receives $26.39 (or 33%) of the Plan's payment, while HMA receives $16.00 (or 20%).

52.     The discrepancy between SAS's compensation and the TPAs' is wider with respect to family coverage. For example, under the Tiger Labor and Staffing CPI, for a family enrollment in WellMEC coverage, SAS receives $111.17 (or 54.2%) of the Plan's total contribution, while HMA receives the same flat fee of $16.00 (or 7.8%). Similarly, under the Wegis Ranch CPI, for a family enrollment in WellMEC coverage, SAS receives $141.17 (or 58.8%) of the Plan's payment, while HMA receives the same $16.00 (or 6.7%). SAS performs the same services whether the participant enrolls in a single-employee or a family plan, but a TPA's workload increases because of the additional individuals—and potentially more claims— covered. Yet SAS's fee increases for higher-tier coverage while HMA's remains flat.

53.     Additionally, the fees SAS directs to itself approximate the amount the Participating Plans pay in medical claims. For example, for all the claims adjudicated by HMA

between 2018 and 2020, the Providence MEWA paid just over $1 million for benefits per month (on average), whereas SAS's monthly fee was as high as $780,000 (based on its fee received in February 2019).

54.     SAS also collects a fee for services performed by its Strategic Business Unit ouTPAce, despite ouTPAce providing no discernible service to the Participating Plans. SAS intended for ouTPAce to be a customer call center, but it never became operational. Nevertheless, the CPIs sent by SAS to claims administrators include fees to multiple of SAS's Strategic Business Units, including ouTPAce.

55.     SAS also unilaterally directs compensation to be made to its affiliate, PIC, the amount of which is variable and unpredictable. The amount of PIC's compensation depends on the amount of contributions sent by the Participating Plans (which is set by SAS and varies for each client). After the TPAs receive the Plans' contributions, they distribute a portion of those contributions to pay the fees of the MEWA service providers (except for PIC) pursuant to SAS's directions. After divvying up the fees, TPAs then use another portion of the Plans' contributions to replenish their Claims Accounts (if necessary) so that they meet a minimum balance set by SAS. The amount needed to replenish the Claims Accounts varies each month depending on the starting balance.

56.     The TPAs then send whatever remains of the Plans' contributions to PIC pursuant to SAS's instructions, no matter what that amount is. The amount of funds that PIC receives thus varies depending on (a) the amount of contributions from Participating Plans, (b) the amount of fees paid to other service providers, and (c) the amount needed to replenish the Claims Accounts. Neither the amount nor the variable nature of PIC's compensation is disclosed to the Participating Plans.

57.    The funds transferred from TPAs to PIC are deposited into bank accounts under PIC's name at Banco Popular, in Puerto Rico. The accounts include, but are not limited to, those ending in the following numbers: -1129, -9630, -0667, -2350, -9312, -9923, and -9915.  Funds transferred to PIC were also deposited into a bank account under PIC's name at Wells Fargo, N.A., with an account number ending -4609.

58.    Moreover, PIC has never received and has never had to pay a claim for reinsurance. While PIC is responsible for paying any claims that exceed the amount of funds in the Claims Accounts, the Claims Accounts have never been overdrawn (due to the very low cost of benefits resulting from preventive-service-only coverage offered by the Plans).

59.    The sums received from Plan contributions result in large profits for PIC, which PIC distributes as dividends to its owners, Anjo and Momentum Capital (which were in turn owned by Renfro, Bryan, and Zieger at the relevant time). For example, in 2019, PIC earned a net income of $14.7 million and distributed $12.6 million of that as dividend payments to Renfro, Bryan, and Zieger. For the first half of 2020, PIC earned a net income of $5.3 million and distributed $6.6 million in dividend payments to Renfro, Bryan, and Zieger.

60.    SAS also directs a significant portion of the Participating Plans' contribution payments to pay the fees of the enrollers. The enrollers include the companies Crystal Bay, Enroll Prime, and Enrollment First.

61.    While the enrollers market SAS's plans to potential new employer clients and enroll individuals in the Participating Plans, the enrollers provide no discernible ongoing administrative service to the Participating Plans.

62.    SAS and its executives direct payments out of Plan assets to the enrollers without any review or approval by the employer sponsors or any other independent fiduciary of the

Participating Plans. SAS directs the TPAs to pay these rates to the enrollers through the CPIs that SAS issues.

63.     Between 2016 and 2022, the enrollers received over 17% of all the contributions paid by the Participating Plans.

## COUNT ONE

### (Against SAS, Renfro, Bryan, and Zieger for Self-Dealing and Breaching Fiduciary Duties by Paying SAS with Plan Assets)

64.     Paragraphs 1 through 63, above, are incorporated by reference.

65.     SAS, Renfro, Bryan, and Zieger operate and administer the entire Providence MEWA through SAS's three Strategic Business Units (Incela, ABC, and ouTPAce).

66.     SAS, Renfro, Bryan, and Zieger determine for themselves, without disclosure to the Participating Plans, multiple fees allocated to each of SAS's business units. Employer-sponsors of the Participating Plans do not authorize the specific fees that SAS collects.

67.     The fees SAS directs to itself are excessive. Depending on the particular Participating Plan and coverage tier, SAS may receive as much as 58.8% of the Plan's contribution as compensation for itself.  SAS often receives more than the TPAs as compensation from the Participating Plans, despite the TPAs performing the bulk of the ongoing administrative work necessary to operate the Plans.  SAS also authorizes a fee to its Strategic Business Unit ouTPAce, though ouTPAce provides no discernible service to the MEWA.

68.      SAS, Renfro, Bryan, and Zieger are fiduciaries to the Participating Plans based on the above-described actions, because they exercise discretionary authority over Plan management as well as authority and control over Plan assets by deciding how much to pay SAS out of Plan assets.

69.     By the actions and failures to act as described above, SAS, Renfro, Bryan, and Zieger:

a.      failed to discharge their duties with respect to the Participating Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable expenses of administering the Participating Plans, in violation of ERISA section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

b.      failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

c.      dealt with the assets of the Participating Plans in their own interest, in violation of ERISA section 406(b)(1), 29 U.S.C. § 1106(b)(1); and

d.      acted on behalf of a party whose interests were adverse to the interests of the Participating Plans or the interests of their participants and beneficiaries, in violation of ERISA section 406(b)(2), 29 U.S.C. § 1106(b)(2).

**COUNT TWO**

**(Against SAS, Renfro, Bryan, and Zieger for Self-Dealing and Breaching Fiduciary Duties by Paying PIC with Plan Assets)**

70.     Paragraphs 1 through 69, above, are incorporated by reference.

71.     At all relevant times, Renfro, Bryan, and Zieger owned PIC through their ownership of the holding company Suffolk Holdings. Renfro, Bryan, and Zieger simultaneously

serve as executives of both SAS and PIC. As owners of PIC, Renfro, Bryan, and Zieger receive dividends from PIC's profits.

72.     SAS, Renfro, Bryan, and Zieger selected SAS's affiliate, PIC, to provide reinsurance services for the Providence MEWA and its Participating Plans. On behalf of SAS, Renfro, Bryan, and Zieger directed payments to PIC from assets of the Participating Plans, without any review or approval by any independent fiduciaries of the Participating Plans as to the amount of PIC's compensation.

73.     PIC's compensation is unreasonable because of its variable and unpredictable nature, which is not disclosed to sponsoring employers or participants. In addition, PIC has neither received nor had to pay a claim for reinsurance for any of the Participating Plans, allowing it to pocket all the Plan contributions it receives. PIC's ability to reap large profits is the product of SAS's plan designs, which intentionally cover very limited health benefits and thus incur low costs.

74.     By the actions and failures to act as described above, SAS, Renfro, Bryan, and Zieger:

a.     failed to discharge their duties with respect to the Participating Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable expenses of administering the Participating Plans, in violation of ERISA section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

b.     failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like

character and with like aims, in violation of ERISA section 404(a)(1)(B), 29

U.S.C. § 1104(a)(1)(B);

c.    dealt with the Participating Plans' assets in their own interest, in

violation of ERISA section 406(b)(1), 29 U.S.C. § 1106(b)(1); and

d.    acted in a transaction involving the Participating Plans on behalf of

a party (or representing a party), whose interests are adverse to the interests of the

Plan or the interests of its participants or beneficiaries, in violation of ERISA

section 406(b)(2), 29 U.S.C. § 1106(b)(2).

e.    caused the Participating Plans to engage in transactions that they

knew or should have known constituted a direct or indirect "furnishing of goods,

services, or facilities between the plan" and PIC, a "party in interest," in violation

of ERISA section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

### COUNT THREE

**(Against SAS, Renfro, Bryan, and Zieger for Breaching Fiduciary Duties by Authorizing Payment of Excessive Fees to the Enrollers)**

75.    Paragraphs 1 through 74, above, are incorporated by reference.

76.    As described above, SAS authorizes payment of fees from Plan contributions to

the entities that enroll employers in the Providence MEWA ("enrollers").

77.    On behalf of SAS, Renfro, Bryan, and Zieger directed payments to the enrollers.

78.    Between 2016 and 2022, the enrollers received over 17% of all the contributions

paid by the Participating Plans. These fees are excessive because the enrollers provide no

discernible ongoing administrative service to the Participating Plans.

79.    By the actions and failures to act as described above, SAS, Renfro, Bryan, and

Zieger:

a.      failed to discharge their duties with respect to the Participating Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable expenses of administering the Participating Plans, in violation of ERISA section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

b.      failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

c.      caused the Participating Plans to engage in transactions that they knew or should have known constituted a direct or indirect "furnishing of goods, services, or facilities between the plan" and the enrollers, who are service providers and thus a "party in interest," 29 U.S.C. § 1001(14)(B), in violation of ERISA section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C);

d.      caused the Participating Plans to transfer to, or use by or for the benefit of a party in interest, of any assets of the plan, in violation of ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

### COUNT FOUR

### (Against PIC, Renfro, Bryan, and Zieger for Knowingly Participating in SAS's Fiduciary Breaches)

80.     Paragraphs 1 through 79, above, are incorporated by reference.

81.     Renfro served as Chief Legal Officer of SAS and was one of its primary decisionmakers, including authorizing the fees paid to SAS, PIC, and the enrollers.

82.    Bryan served as Chairman of SAS and was one of its primary decisionmakers for SAS, including authorizing the fees paid to SAS, PIC, and the enrollers.

83.    Zieger served as Vice-Chairman of SAS and was one of its primary decisionmakers, including authorizing the fees paid to SAS and PIC.

84.    Even if they are not themselves fiduciaries, Renfro, Bryan, and Zieger, through their involvement in SAS, knowingly participated in SAS's fiduciary breaches as alleged in Counts 1, 2, and 3, and are thus subject to liability under ERISA section 502(a)(5), 29 U.S.C. § 1132(a)(5).

85.    Because Renfro, Bryan, and Zieger also served as PIC's executives, their knowledge is imputed to PIC, such that PIC also knowingly participated in SAS's breaches of fiduciary duty and prohibited transactions as alleged in Count 2, and are thus subject to liability under ERISA section 502(a)(5), 29 U.S.C. § 1132(a)(5).

## COUNT FIVE

### (Against SAS for Failing to Comply with ERISA Reporting Requirements)

86.    Paragraphs 1 through 85, above, are incorporated by reference.

87.    SAS has never on behalf of the Providence MEWA filed a "Form M-1 Report for Multiple Employer Welfare Arrangements (MEWAs) and Certain Entities Claiming Exception (ECEs)", which is required to be filed by MEWAs, in violation of ERISA section 101(g), 29 U.S.C. § 1021(g).

## PRAYER FOR RELIEF

WHEREFORE, the Secretary asks that this Court enter an Order:

88.    Permanently removing Defendants **SAS, PIC, Renfro**, **Bryan, and Zieger** and anyone acting on their behalf, including their officers, agents, employees, assigns, subsidiaries,

affiliates, service providers, accountants, attorneys, and any other party acting in concert with them or at their direction, as fiduciaries, service providers, and administrators of the Participating Plans.

89.    Permanently enjoining Defendants **SAS, PIC, Renfro**, **Bryan, and Zieger**, and anyone acting on their behalf, including their officers, agents, employees, assigns, subsidiaries, affiliates, service providers, accountants, attorneys, and any other party acting in concert with them or their direction from acting as a fiduciary, service provider, or administrator to the Participating Plans and the Providence MEWA;

90.    Appointing an Independent Fiduciary to the Participating Plans and the Providence MEWA, with full and exclusive fiduciary authority over the Participating Plans' administration and management, and full and exclusive control over the Providence MEWA and Participating Plans' assets, including, but not limited to:

      a.    Authority to exercise all fiduciary responsibilities relating to the Providence MEWA and Participating Plans;

      b.    Authority to take exclusive control of all plan assets of the Providence MEWA and the Participating Plans;

      c.    Authority given to trustees and/or TPAs under the terms of the documents governing the Providence MEWA and Participating Plans;

      d.    Exclusive authority to appoint, replace and remove such administrators, trustees, attorneys, employees, assigns, agents, and service providers as the Independent Fiduciary shall, in the Independent Fiduciary's sole discretion, determine as necessary to aid the Independent Fiduciary in the exercise

of the Independent Fiduciary's powers, duties, and responsibilities to the Providence MEWA and Participating Plans;

e.      Authority to terminate the Providence MEWA and Participating Plans, if in the best interest of the Providence MEWA and Participating Plans and, in that event, to establish a claims submission deadline, and to adjudicate all claims filed by such deadline, and to deny claims not filed by the claims submission deadline;

f.      Authority to pursue recovery of monies owed and due to the Providence MEWA and Participating Plans from any person obligated to make such payments under the terms and conditions of the Providence MEWA and Participating Plans;

g.      Authority to identify, pursue, and disburse recovery of Providence MEWA and Participating Plans' assets, as well as any monies to which the Providence MEWA or Participating Plans have a right of recovery;

h.      Authority to identify and pursue claims on behalf of the Providence MEWA and Participating Plans;

i.      Except as provided herein, the authority to delegate to such administrators, trustees, attorneys, employees, assigns, agents, and service providers such fiduciary responsibilities as the Independent Fiduciary shall determine appropriate. The Independent Fiduciary may not, however, delegate the authority to appoint, replace, and remove such administrators, trustees, attorneys, employees, assigns, agents, and service providers, or the responsibility to monitor

the activities of the Providence MEWA and Participating Plans' trustees, attorneys, agents, and service providers;

> j.    Authority to make all required filings on behalf of the Providence MEWA, including Forms M-1; and

> k.    Authority to pay the reasonable and necessary fees of service providers from the Providence MEWA and Participating Plans' assets.

91.    Requiring Defendants **SAS, PIC, Renfro, Bryan, and Zieger** to provide to the Independent Fiduciary all documents, records, accounts or other information required to administer and manage the Participating Plans;

92.    Requiring Defendant **SAS** to file all delinquent Forms M-1;

93.    Requiring Defendants **SAS, Renfro, Bryan, and Zieger** to jointly and severally restore all losses, including interest, they caused to the Participating Plans;

94.    Requiring Defendants **SAS, PIC, Renfro, Bryan, and Zieger** to jointly and severally make equitable restitution to the Participating Plans' participants of all losses resulting from their fiduciary breaches;

95.    Requiring Defendants **SAS, PIC, Renfro, Bryan, and Zieger** to jointly and severally reimburse the fees and expenses of the Independent Fiduciary;

96.    Requiring Defendants **SAS, PIC, Renfro, Bryan, and Zieger** to disgorge to the Providence MEWA all profits and fees and other monies earned in connection with their violations;

97.    Permanently enjoining Defendants **SAS, PIC, Renfro, Bryan, and Zieger** from ever acting as a fiduciary, service provider, or trustee to any plan covered by Title I of ERISA;

98.    Awarding the Secretary her costs incurred in this civil action;

99.     Retaining jurisdiction to ensure that the Independent Fiduciary and MEWA

participants and beneficiaries receive all monies they are entitled to; and

100.     Granting such other relief as may be equitable, just, and proper.

Dated: November 5, 2024                              Respectfully Submitted:

SEEMA NANDA
Solicitor of Labor

WAYNE R. BERRY
Associate Solicitor
Plan Benefits Security

JEFFREY HAHN
Counsel for Appellate and Special Litigation

/s/   Katrina Liu
KATRINA LIU
Senior Trial Attorney
D.P.R. Bar No. G03401

JAMIE BOWERS
Trial Attorney
D.P.R. Bar No. G03415

SARAH HOLZ
Senior Trial Attorney
D.P.R. Bar No. G04105

Attorneys for Plaintiff Julie A. Su, Acting Secretary
of Labor

United States Department of Labor
Office of the Solicitor
Plan Benefits Security Division
P.O. Box 1914
Washington, D.C. 20013
liu.katrina.t@dol.gov
bowers.jamie.l@dol.gov
holz.sarah.d@dol.gov
Direct: (202) 693-5600

Fax: (202) 693-5610